J-A18034-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| TOM SIPES | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DONALD N. HOPPER, CAROLYN H. | : | |
| HOPPER, WAYNE R. HOPPER, G.J. | : | |
| HOPPER, G.J. HOPPER | : | No. 1867 WDA 2016 |
| MANUFACTURING, INC., G.J.H. & | : | |
| SONS COMPANY D/B/A WFI | : | |
| BURNETTE HOPPER, MARY HOPPER, | : | |
| NEAL HOPPER, LYNN H. WELLS, | : | |
| MARY H. HOPPER, G.J. HOPPER & | : | |
| SONS, INC., DONALD N. HOPPER, | : | |
| ADMINISTRATOR, AND ANY OTHER | : | |
| PERSON OR PERSONS, | : | |
| CORPORATIONS, PARTNERSHIPS, | : | |
| OR ASSOCIATION HAVING OR | : | |
| CLAIMING TO HAVE ANY RIGHT, | : | |
| TITLE, OR INTEREST IN AND TO | : | |
| THE REAL ESTATE HEREIN | : | |
| DESCRIBED AS AN HEIR, LEGATEE, | : | |
| EXECUTOR, ADMINISTRATOR, | : | |
| SUCCESSOR OR ASSIGNEE OF THE | : | |
| AFORMENTIONED | : | |
| | : | |
| Appellants | | |

Appeal from the Order Dated November 10, 2016
In the Court of Common Pleas of Beaver County
Civil Division at No(s): 11010 of 2008

BEFORE: BOWES, LAZARUS and OTT, JJ.

MEMORANDUM BY OTT, J.:                    FILED JANUARY 03, 2018

Donald N. Hopper[1] (Hopper) appeals from the judgment, made final by the order denying Hopper's post-trial motions, entered on November 10, 2016, in the Court of Common Pleas of Beaver County. The underlying non-jury trial, held before the Honorable Deborah A. Kunselman, on March 21, 2016 and April 20, 2016, involved Hopper's claim that Sipes had converted property he had left in a factory that was sold to Sipes at a tax sale. In this timely appeal, Hopper claims the trial court erred, first, in failing to find Sipes converted Hopper's property, and, second, in failing to properly value the property. After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

We recite the facts as determined by the trial court and related in the August 23, 2016 Non-Jury Decision and Order.

> The real property in question has housed various iterations of china production plants since the last years of the 19th century. In around 1891, the Mayer China Company operated in the building, producing quality china for wealthy locals. In 1968, International Pipe and Ceramic Corporation purchased the building, and in 1979 Mayer China retook ownership. Sometime in the 1980s, Syracuse China began operating out of the factory, again producing china. After Syracuse China ceased operations, the factory was shut down for several years until Beaver Falls China took over operation in the [year] 1992. Beaver Falls China then ceased operations, and, at some point, the factory was obtained by Mellon Bank in the mid 1990s. Mellon Bank then leased the factory to Royal Monarch. Royal Monarch revived the company briefly and again produced china. One of the

---

[1] For ease of discussion, we will refer to the collective appellants as simply Donald N. Hopper (Hopper).

Defendants, Donald N. Hopper, worked for Royal Monarch during this time. Royal Monarch eventually stopped leasing the factory from Mellon Bank, and the building and equipment sat idle for roughly two years.

In 1999, Mr. Hopper and his fellow Defendants purchased the mortgage to the property from Mellon Bank. Per Mellon Bank's obligations, Defendants carried out a tax sale and purchased the property at that sale, and subsequently went into business as Brighton China Company, Incorporated.

Mr. Hopper testified that when he took over operations at the facility, he did not conduct an independent inventory of equipment left in the facility, but instead relied on an earlier report, from 1992.

[Hopper] operated the facility as a china factory from the time of purchase in 1999 until about 2003. Mr. Hopper testified that for several reasons, including the termination of a gas purchase contract and the need to buy more expensive gas on the open market, the company fell into financial despair and shut down operations. Mr. Hopper also testified that all utilities were shut off around 2003.

After the factory ceased operations around 2003-2004, the building, which was old to start with, fell into further disrepair. The roof cracked, water leaked into the facility and onto the equipment, and eventually large pieces of the roof fell into the factory. Squatters may have temporarily lived in the building, and animals entered and exited at will.

On December 4, 2006, the property went up for a tax sale. Mr. Hopper came to the sale with a cashier's check for $1,500.00 in an attempt to retain the property and allegedly restart operations on behalf of Defendants. Mr. Hopper testified that he only brought $1,500.00 because that was all he had available to him, in a particular bank account, and because he was not aware that he would have to pay costs, in addition to the purchase price, at the tax sale.

Plaintiff, Mr. Sipes, also came to the tax sale where he purchased the property for $2,500.00. All parties agree that Mr.

Sipes only purchased the real estate at the tax sale, and that any interest in the manufacturing equipment that remained in the facility belonged to Defendants. However, Defendants provided no list or inventory of the equipment left in the building to Mr. Sipes after the sale. Shortly after the sale, Mr. Sipes met with Mr. Hopper about possibly leasing the facility, but the parties could not agree on terms. There was also an offer to charge Defendants a monthly fee to continue storing equipment it the facility, but no payment was ever tendered; and Mr. Hopper and the other Defendants never removed the property [equipment] from the building.

Mr. Sipes testified that after he purchased the real estate, Columbia Gas Company came to the property to remove the equipment in question due to an unpaid lien, and that Mr. Sipes was forced to pay $10,000.00 in order to keep the equipment. Through[] his attorneys, Mr. Sipes communicated to Mr. Hopper, on April 10, 2007, that Mr. Hopper and his group would be required to reimburse the $10,000.00 at the time Mr. Hopper came to remove the equipment. Mr. Hopper contested whether the gas company had any property interest in the equipment in question, and maintained that he did not need to reimburse Mr. Sipes the $10,000.00. In the same letter of April 10, 2007, Mr. Sipes's attorney told Mr. Hopper and the Defendants that they would have until April 16, 2007 to remove any equipment and personal property left in the facility.

Following the tax sale, Mr. Hopper came to the facility twice to attempt to remove equipment. One each occasion, Mr. Hopper brought his secretary's son and/or a friend of that individual. However, Mr. Sipes turned Mr. Hopper away because none of the individuals who came to the facility were qualified to move the commercial equipment, and they had no materials or tools to properly move the equipment. Mr. Sipes feared that inexperienced people attempting to move this industrial equipment could be dangerous to both the individuals and to the facility.

After the deadline of April 16, 2007, Mr. Sipes contacted a gentlemen named Mr. Mariani to scrap the metal equipment that was left and to remove all of the garbage in the facility. Allegedly, one piece of equipment (a label maker) was sold to another entity,

but there was no testimony about the value of this equipment, how much it sold for, or to whom it was sold. Initially, Mr. Sipes had arranged to pay Mr. Mariani to remove the garbage from the facility, but instead gave Mr. Mariani the remaining equipment to scrap in exchange for removing the garbage.

A year later, Mr. Sipes filed an action to quiet title on April 9, 2008. Several months later, Defendants filed their answer, new matter, and counterclaim on September 4, 2008. The parties resolved the quiet title portion of the lawsuit. In their counterclaim for conversion, Defendants are seeking compensation for the disposal of the china-making equipment left in the factory.

At the non-jury trial, Mr. Hopper testified, relying on a handwritten list of property created in 1992 by an unidentified third party, he believed the property in question was worth $9,273,800.00. He further testified that his own value of the property, based on the same handwritten inventory list, was around $600,000.

To date, all the pieces of equipment in question, along with all of the other contents of the factory, have been removed and scrapped or otherwise disposed of.

Non-Jury Decision and Order, August 23, 2016, at 2-5.

Initially,

our standard of review in non-jury cases is limited to:

a determination of whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion. When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected.

> Company Image Knitware, Ltd. v. Mothers Work, Inc., 909 A.2d 324, 330 (Pa. Super. 2006) (citation omitted). Additionally, this Court has stated that we will respect a trial court's findings with regard to the credibility and weight of the evidence "unless the appellant can show that the court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence." J.J. DeLuca Co. v. Toll Naval Associates, 56 A.3d 402, 410 (Pa. Super. 2012), quoting Ecksel v. Orleans Const. Co., 360 Pa. Super. 119, 519 A.2d 1021, 1028 (1987).

Gutteridge v. J3 Energy Group, Inc., 165 A.3d 908, 914 (Pa. Super. 2017).

Further, in order to prove conversion,

> [p]ursuant to Pennsylvania case law, a conversion is widely understood as "the deprivation of another's right of property in, or use or possession of, chattel, or other interference therewith, without the owner's consent and without lawful justification." McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 659 n. 3 (Pa. Super. 2000) (quoting Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964)). A person may incur liability for conversion by "[u]nreasonably withholding possession from one who has the right to it." Martin v. National Sur. Corp., 437 Pa. 159, 165, 262 A.2d 672, 675 (1970) (emphasis supplied).

PTSI, Inc. v. Haley, 71 A.3d 304, 313 (Pa. Super. 2013).

We have found no specific definition of "lawful justification" as it applies to conversion. The trial court noted, without objection, that the central question to be answered in this matter was, how long was Sipes required to allow Hopper's property to remain in the factory before he could dispose of it. The trial judge also stated that the question was a factual determination that

- 6 -

she would resolve.  There was also no objection to this ruling.  See N.T. Non-

Jury Trial, 4/20/2016 at 397-99.

In determining that Sipes acted reasonably regarding the removal of the

manufacturing equipment, the trial court stated:

> We did not find that Mr. Sipes unreasonably withheld possession of the equipment from Mr. Hopper.  However, given the facts of the case, we did find that Mr. Hopper's actions in attempting to retrieve the equipment were unreasonable.  If the equipment was as valuable as Mr. Hopper claimed, the court believes he should have undertaken substantial efforts to remove it timely (and/or should have been more proactive in preventing the tax sale from even occurring.)  First, Mr. Hopper did not bring adequate funds to the sale to pay the outstanding taxes, along with the costs, in order to remove the property from the tax sale list.  While this fact may be irrelevant to the claim for conversion, because it occurred prior to Mr. Sipes purchasing the property, it goes to show Mr. Hopper's cavalier attitude toward this property, and shows it had minimal, if any, value.[2]  He brought $1,500 to the tax sale, and the property was sold to Mr. Sipes for $2,500.
>
> Then, once the property was sold, Mr. Hopper did not act promptly to have the equipment removed.  If he was so concerned about this valuable equipment, he should have hired professional movers and arranged for another storage location until it could be sold.  Instead, he showed up once or twice with a non-professional mover, who was not trained in removing commercial equipment.  Mr. Hopper did not look into contacting any professional until the spring (May or June) of 2007, when Mr. Norris went to look at the

_____

[2] We agree with the trial court that this information is not directly relevant to the conversion claim.  We also agree with the trial court that this information provides important context for Hopper's later action, or inaction, regarding the removal of the manufacturing equipment.

equipment.[3]   In fact, Mr. Norris testified that it would be "quite a large job and very labor intensive to remove it."   To move the machinery would have required some expertise with rigging procedures, and the use of professional equipment including forklifts, dollies and cranes.   It also required part of the building to be torn down   The equipment was too large to fit through any doors of the building.

Instead of contacting someone right away, following the tax sale, Mr. Hopper basically left his assets to sit in the building he no longer owned for weeks on end.   He was living out of state, and the court believes his property was "out of sight and out of mind".   Finally, after four months, when the new owner gave him an ultimatum and a final date for removal of the equipment, Mr. Hopper still did not arrange for its removal or provide a valid excuse for why he needed additional time.   Essentially, he had no plans for any of this equipment.

Mr. Hopper claims he was unable to move the property because Mr. Sipes demanded $10,000 prior to him being able to move the equipment.   Mr. Sipes had to pay the outstanding gas bill to have the heat turned on in the building and wanted Mr. Hopper to reimburse him for that amount.   Mr. Hopper could have taken legal action between December 2006 and May 2007, if he believed [Mr. Sipes] was wrongfully withholding his property. Instead, he did nothing. In fact, his counterclaim was only filed after Mr. Sipes sought to perfect the title on the property by filing the instant quiet title action in April 2008, a year later.   Then neither party moved the case along until the non-jury trial in 2016.

Although Mr. Hopper argues at a minimum he should have had thirty (30) days to remove the property and he was given only six (6) days, the court finds that he, in fact, had from the time of the sale in December 2006 until April 16, 2007, approximately four months, to remove the property.   In short, the court finds this time was more than reasonable, particularly considering that

_____

[3] We note that this took place at least one month after the deadline to remove the equipment had passed.

> Mr. Hopper gave no indication that actual efforts to move the equipment were forthcoming. The court further finds that Mr. Sipes did not unreasonably withhold possession of Mr. Hopper's assets, given the facts of this case.

Trial Court Opinion and Order, 11/10/2016, at 2-4.

The trial court's reasoning is supported the by facts of record. Hopper knew that the manufacturing equipment was in the factory from the time it closed in late 2003 to early 2004 until he lost ownership of the real estate in the tax sale in December, 2006. Thereafter, having been in contact with Sipes, he knew that his equipment would have to be removed from the property. Despite that knowledge, the trial court found that Hopper took no reasonable steps to protect, retain or remove that property from the factory. The facts of record demonstrate that Hopper did not attempt to retain the services of a professional mover until approximately one month after the deadline had passed, and approximately five months after the tax sale. The trial court found Sipes did not do anything to prevent Hopper from removing the equipment because Hopper did nothing to attempt to remove the equipment. Additionally, the trial court determined that Hopper's near total lack of interest in retaining his property and the lapse of four months between the tax sale and the ultimatum represented a reasonable time to allow Hopper to act, and that his failure to act provided the legal justification for Sipes to

dispose of the manufacturing equipment that was left in the building. Accordingly, Sipes did not convert Hopper's manufacturing equipment.[4]

Because Sipes did not convert Hopper's property, the trial court committed no error regarding damages, as there were no damages to calculate.

Judgment affirmed. Motion to withdraw as counsel is granted.[5] Motion to supplement record is granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/3/2018

-------------------------------------

[4] This decision is not meant to create a specific four-month standard for such situations. We simply find that under the instant circumstances, four months was ample time.

[5] Counsel for Hopper, Thomas E. Reilly, Esq., has asserted in his motion to withdraw as counsel that he has not been paid for his services in this matter and does not anticipate payment to be forthcoming. Motion at ¶ 3. Attorney Reilly does not anticipate further work in this matter. Id. at ¶ 7. The motion was filed September 5, 2017, all interested parties have been notified of the motion and, to date, no replies have been filed contesting Reilly's motion. All interested parties have been notified of the motion.